John Didon Typically under Social Security ruling 92-2P a claimant's treating physician is afforded controlling weight to the extent it is consistent with other medical evidence and based on objective findings. What happened here was the ALJ afforded the opinion of the claimant, Ms. Grable's treating physician, Dr. Sandberg, an unclear amount of weight. She says she afforded it not great weight, but it's not clear whether she afforded it any weight whatsoever. First of all, that in itself should be a reversible error under McCadney v. Struh because it's not clear what analysis she performed in order to reach the conclusion that it was afforded no weight or whatever weight she gave it. We don't require perfection in opinion writing. The ALJ clearly thought that the specialist was the more qualified opinion as to febrile myalgia. I agree. You know, proceed from there. We're not going to do this on an absence of analysis. Well, I think the difficulty with her opinion is that she says she didn't afford it great weight, but it looks like she afforded it zero weight, and that appears to be the position of the commissioner, and I tend to agree. It looks like she gave it zero weight, but she doesn't say that, and when you say we didn't give something great weight, that's typically a way of expressing that we gave it some weight, but it's not clear that that's the case here at all. Regarding her other analysis, she says, first of all, you know, this is a matter reserved to the commissioner in any event because basically the doctor's opining that she's disabled by saying she can't work eight hours a day, and typically that is something reserved to the commissioner, the finding of disability, but I think what the doctor was expressing here was that she was not the amount she was able to work rather than the fact she was completely and totally disabled. On one hand, you know, the amount that somebody's able to work is something that a doctor can opine on. Whether somebody's disabled is something that's reserved to the ALJ, but moreover, even if she was, even if Dr. Sandberg was saying she's totally disabled and, you know, that's a legal conclusion, we can't ignore it altogether. The ruling 96-5P says that we still need to give it some weight and consider it, and again, that goes back to the problem that we don't know what weight was given to this doctor's opinion. She erroneously gives his opinion less weight because he's not a rheumatologist, but as the commissioner, I think, will concede, there's no requirement that fibromyalgia be diagnosed by a rheumatologist, and as Judge Loken has pointed out, it's perfectly acceptable to give greater weight to a specialist than to a non-specialist, and he's a general practitioner. He was a family practitioner, so he's certainly a non-specialist, but there are other specialists in the record. Dr. Bronson was a rheumatologist, and he diagnosed fibromyalgia. So I don't think we can discount Dr. Sandberg's opinion strictly on the basis that the rheumatologists in the record don't think she had fibromyalgia. I think even the rheumatologists in the record are split 50-50 on whether or not she had fibromyalgia. Are the attributes of fibromyalgia really clearly developed? There's some controversy, I think, in the medical field. No, and I think that's really part of the difficulty that Ms. Grable has, is that fibromyalgia is not well-defined. For many years, it was sort of not regarded as a real disease, and I think people now realize it is a real disease, but certainly the medical knowledge on fibromyalgia is still developing, and I think that's reflected by the fact that Social Security Regulation 12-2P was issued after the commissioner issued its final decision in this case, and that regulation outlines more specific guidelines for tender point testing. It says there are 18 tender points, and you have to have pain in 11 to be diagnosed with fibromyalgia. That's a real good, bright-line way to deal with these cases, but it wasn't applicable to this case, and I think the reason for that is, at least in part, that the medical knowledge on fibromyalgia is still developing, and of course the law tends to lag behind the development of the medical knowledge, and so to the extent that the doctors here diagnose things like chronic pain syndrome or generalized pain, I don't think that's necessarily inconsistent with the finding of fibromyalgia. They just didn't use the magic word, but a lot of them did use the magic word. Three doctors in the record diagnosed her with fibromyalgia. Why is it a magic word, particularly when it's so difficult to pin down? No, you're right. It's the standard review that's your big hurdle here. I agree with you. The more undefined and controversial and unclear the symptoms of impairment are, the bigger your burden in judicial review is. I mean, the substantial evidence test is what it is. It's very difficult. I agree with you, and I think the clearest error that was committed was the discounting of Dr. Sandberg's opinion. I don't think the reasons she gave, she basically gave four reasons for discounting his opinion, and three and a half of them were wrong. Some of the medical evidence is contrary to Dr. Sandberg's opinion, but some supports it. But the ALJ also went out and got additional medical opinions that then were inconsistent. Right, right. But those are the ones she gave weight to. Those are the only ones she gave weight to. That's what the ALJ's prerogative is. Absolutely, that's right. But she's also bound by the regulations. It's almost unreviewable. An ALJ, when the medical evidence is at least as supportive, if not more supportive, of the contrary opinions, the ALJ gets to make the call. I agree that it's a difficult position, but I do think that she's still bound by the Social Security regulations and the Social Security rulings, and those make clear that you should afford greater weight to treating and examining physicians than people who just review the medical records. And she did exactly the opposite. So to the extent she is bound by those. Do you think those rulings are more rigorous than our Pulaski standard? I don't know how you would compare it. They derive from and are less restrictive than. Some of our Pulaski opinions. And I think the ALJ's analysis was consistent with our Pulaski jurisprudence. I think that the facts determine each case, obviously. And in this case, there's no dispute that Dr. Sandberg was the treating physician and the examining physician. And so unless she can come up with good reasons to discount his opinion, then she needs to give it controlling weight. Now, she came up with some reasons. The question is whether those are good reasons. And I think if you conclude that his opinion was not an opinion that she was disabled in a legal sense, but rather that she simply couldn't work as a matter of his medical opinion, then I think you have to get into her reasons why she disbelieves him. And I think her reasons for disbelieving him are not that strong. You don't have to be a rheumatologist to diagnose this. But she thinks you do. I mean, she's incorrect about that. Whether she's wrong enough to warrant reversal is maybe a separate question, and I think that's what Judge Loken was getting at. But certainly some of her reasons for discounting the opinion of Dr. Sandberg were incorrect, and I think the commissioner would concede that. But Dr. Sandberg wasn't the only doctor who opined that she had fibromyalgia and could not work. Dr. Kumar conducted tender point testing, which is the objective test that we use to diagnose fibromyalgia, and opined that she couldn't work. Again, she says that he was not a specialist. He's a neurologist instead of a rheumatologist. That was a post-hearing submission. Dr. Kumar, his examination of her or his? I thought the ALJ said his opinion was obtained post-hearing to attack expert Winkler. Is that wrong? I would have to look and double-check on that. My recollection and my notes reflect that his examination of her was outside the relevant period, but I thought he provided his medical opinion at the hearing based on his review of the medical record. But I will double-check on that. I'm not sure on that. The record is the record. Right, right, right. I'll reserve the rest of my time for rebuttal if there are no other questions right now. Very well. Thank you. We'll hear from the secretary, counsel for the secretary, Mr. Hayes. Good morning, sir. Good morning. May it please the court. Counsel. Jeremiah Hayes on behalf of the commissioner. This case involves a Title II application under the Social Security Act. In that application, plaintiff alleged that she became disabled in July of 2004. Because it is a Title II claim, it also involves the expiration of her insured status in December of 2009. Between July of 2004 and December of 2009, the ALJ found that plaintiff retained the ability to perform simple, light work and, therefore, was not disabled. In making that determination, the ALJ ---- This was not a Title XVI claim at all? No, it was not. And that's why the relevant time period is limited to. So it was a separate? Did she apply for SSA after? I'm unsure, but it's an income issue. And since it appears her husband's working, she may not have qualified for Title XVI. But I cannot speak to that. In making the determination of plaintiff's RFC, the ALJ properly considered plaintiff's exaggeration, the nature of her medical treatment, the lack of supporting objective evidence, her receipt of unemployment benefits, and the conflicting medical opinions within the record. In regard to plaintiff's exaggeration, the medical records show that she put forth poor and less than maximal effort on testing, and her doctors were unsure whether or not she was giving her best effort. The doctors also noted that she may be embellishing her deficits, and her daily activities were inconsistent with her alleged symptoms. Based on this, the ALJ ordered plaintiff undergo the Minnesota Multifacet Inventory Testing, the MMPI, which suggested that plaintiff was exaggerating her symptoms. Based on these findings, the ALJ properly concluded that plaintiff was not a reliable source of information regarding the extent of her limitations. This is further supported by her medical treatment during the relevant time period. While she claims that she has a disabling mental impairment, she sought no treatment from a mental health specialist during the relevant time period. In regards to her physical impairments, she has relied on conservative treatment and refused more aggressive treatment. Two doctors have refused to see her anymore because of her noncompliance and failure to attend appointments. Her rationale for her noncompliance was that she was, quote unquote, pretty busy. That is inconsistent with a finding of disability. When she did attend her appointments, her symptoms could not be verified by the doctors. She would present with completely positive review of systems, and then when the doctors examined her, those symptoms could not be found. While she alleges a disabling heart impairment, she has undergone exhaustive testing, which has been largely unremarkable. She has also undergone EMG testing that was inconsistent with her allegations, as it was normal. Finally, plaintiff's allegations are inconsistent with her own admissions. While alleging that she was disabled, she received unemployment benefits, which requires her to state that she is willing and able to work. As this court found last month in Whitmore v. Colvin, the receipt of unemployment benefits is compelling and seriously undermines a claimant's assertion they are incapable of working. This court has recognized when there are two or more inconsistent statements in the record, and one of them supports the ALJ's finding, this court must affirm. Here we have an admission from plaintiff that she is able to work. That is consistent with the ALJ's finding that she is not disabled. Finally, the ALJ resolved the conflicts between the medical opinions. Plaintiff's arguments regarding the medical opinions is essentially asking this court to reweigh the regulatory factors and come to a determination that's more favorable to her. However, it is the function of the ALJ and the ALJ alone to resolve the conflicts between the medical opinions. Plaintiff specifically argues that the ALJ did not evaluate Dr. Sandberg's opinion in accordance with the regulations. Plaintiff is mistaken. The ALJ properly recognized that Dr. Sandberg was a treating physician, but not a specialist. Those are regulatory factors 404, 15, 27, C1, C2, and C5. Further, Dr. Sandberg's statement that plaintiff is unable to work because of her medical conditions is conclusory and provides no support for that statement. That's regulatory factor 404, 15, 27, C3. As this court has found, conclusory and unsupported statements such as this are not entitled to significant weight. Finally, Dr. Sandberg's statement is inconsistent with his contemporaneous treatment notes. While providing the notes that plaintiff is unable to work, his objective findings show no significant abnormalities. That's regulatory factor 404, 15, 27, C4. The only thing consistent with Dr. Sandberg's statement is plaintiff's own statements. She walked into her doctor's office requesting a note that she was unable to work. The doctor then provided a note saying, plaintiff is unable to work. That is the sole basis for these statements. As this court found in McCoy v. Astor, the statements of treating physicians that are based on discredited, subjective allegations are not entitled to significant weight. Here, the sole basis for these statements are plaintiff's request for said statements. Plaintiff also relies on Dr. Kumar's examination of her a year after the expiration of her insured status. Again, McCoy v. Astor is instructive. As this court reminded claimants that it is their burden to show the existence of a limitation prior to the expiration of their insured status. Dr. Kumar's examination a year after the relevant time period does not meet that burden. Especially in this case, when Dr. Kumar's findings are specifically refuted and contradicted by the medical evidence during the relevant time period. Dr. Kumar specifically stated that his limitations were supported by an abnormal EMG obtained after the expiration of plaintiff's insured status. However, the EMG testing during the relevant time period was normal. At most, Dr. Kumar's examination reveals a deterioration in plaintiff's condition. It does not establish the existence of limitations prior to December of 2009. Based on the inconsistencies within the record and the very nature of plaintiff's underlining impairments, the ALJ properly obtained the testimony of two medical experts. The ALJ recognized that they were specialists in their fields of studies. That's regulatory factor 404-1527-C5. The medical experts testified at length for several pages at the administrative hearing in which they were cross-examined by both the ALJ and plaintiff's representatives. You apparently have had a lot of experience with these cases. Is fibromyalgia fairly common now? It's becoming more common over the last five years, I'd say, especially. I know early in the 90s, before I started with the agency, there was a lot of uncertainty. However, in 1990, the American College of Rheumatologists came up with the 18-point tender test, and that helped define and drive agency policy. This isn't a loser every time. No, it is not. There are several cases that claimants are found disabled based on fibromyalgia as the sole impairment. The 18-point, as opposed to the console point, is there a relatively recent SSR on that? SSR 12-2P explains and tries to codify what is the accepted medical practice regarding fibromyalgia. Inconsistent with what plaintiff was saying, though, this SSR did not establish the tender point testing. It did not create a new standard. As explained within the SSR, since 1990, the American College of Rheumatologists have had this tender point testing. The 1992 Merck Manual describes the same testing. In 1996, the Southern Circuit and Charchette v. Chattel also discussed this tender point testing. So this SSR, while new, didn't create new standards or new policies in evaluating fibromyalgia. The commissioner's policy regarding fibromyalgia is the same as it is with every impairment, which is that in order to be a severe impairment, it must be medically determinable. In order to be medically determinable, it must be diagnosed by acceptable medical sources based on accepted diagnostic criteria. Here, the 1990 American College of Rheumatologists is the accepted medical standard for diagnosing fibromyalgia. And the existence of fibromyalgia then requires a finding of disability? It does not. You still then evaluate the impairment. That establishes that it's medically determinable, which then can result in work-related limitations, which would define it as severe, and then the ALJ would evaluate what those limitations actually are. This may be irrelevant, but I found it interesting. This case has a long procedural history, doesn't it? Yes. How many hearings have there been? I kept them back in Sioux Falls. There was an initial ALJ hearing in which the ALJ denied plaintiff's benefits following that hearing. The case was then challenged at district court level, and the commissioner voluntarily remanded it to evaluate Dr. Sandberg's statements regarding the unable to work. The ALJ then had a hearing. Unfortunately, we didn't have all the medical records. They had this telephone conversation, and the doctor said, nobody sent me the records. Yes. And so that hearing was closed. They then had a third hearing in which Dr. Winkler testified regarding plaintiff's physical limitations, and then the ALJ decided he needed to order the MMPI testing, and then there was a fourth hearing in which Dr. Winfrey testified regarding plaintiff's mental impairments. So there were a total of four, three of which testimony was taken. This is irrelevant, I suppose, but I noted going through the records she was born on September 11, 1961, so I guess today is her 53rd birthday. Yes. In regards to the medical experts, the ALJ found that these lengthy testimonies were well-reasoned and consistent with the record. Those are regulatory factors 404, 15, 27, C3, and C4. Based on the record as a whole, the ALJ then concluded that plaintiff was capable of a range of simple, light work. The vocational expert then testified that an individual with those limitations could perform plaintiff's past relevant work as a file clerk and other work existing in significant numbers in the national economy. As such, the ALJ properly concluded that plaintiff was not disabled prior to December 2009. That determination is supported by substantial evidence, and as Judge Loken noted, the standard of review is very important here. If the ALJ's decision is within the zone of choice, this court must affirm that decision. Substantial evidence supports the ALJ's decision, and it clearly falls within the zone of choice, and therefore, affirmance is the proper remedy. What year did you say that she was not disabled until? Between July of 2004, her alleged onset date, and December 2009, which is the expiration of her insured status under Title II. When did she get the unemployment? She received unemployment after her alleged onset date. The exact dates are unknown. She testified to it at the first administrative hearing, but the details as to how long were unclear. Are there any other questions? No, apparently not. Thank you, Your Honors. Okay, I'd just like to clarify a couple of things here. As Judge Loken correctly pointed out, Dr. Kumar's opinion was obtained after the hearing, but it was based on his review of the medical records, just as the Commissioner's experts were. His examination was outside of the period, but it does confirm that there was fibromyalgia, at least at that time. I know that might not be strong evidence that she was disabled, but as part of the picture that everybody who has physically seen her has diagnosed her with either fibromyalgia or chronic pain syndrome, it suggests that there is something here. I acknowledge that her credibility is a big problem and was one of the reasons the ALJ ruled as she did. But frankly, I think that's the major reason the ALJ ruled as she did, because the nature of fibromyalgia is such that we rely on subjective complaints of pain as we conduct the tender point testing in order to diagnose fibromyalgia. And so if the ALJ has concluded that the patient isn't credible, then she, I think, discounts the medical opinions to the extent they're based on that patient's subjective reports. What do you have to show about the strength of that opinion of his? Well, the only objective testing we can do for fibromyalgia is to probe around and do this tender point testing. And that was done by Dr. Sandberg, by Dr. Kumar, and by Dr. Bronson. And they didn't document the number of tender points, but they did find tender points on her. To the extent that this standard of 11 tender points existed before this decision became final, I submit that the legal standard didn't require 11 tender points. And I don't think the legal standard in this case is that there must be 11 documented tender points to establish fibromyalgia. At least one Eighth Circuit case that I was looking for documented that we can diagnose fibromyalgia based solely on subjective complaints. So this idea that a certain number of tender points must be documented before we find disability, and that this has been the standard since 1990, is incorrect, at least in a legal sense, at least in this circuit. There's no question that... Medically determinable is not. I mean, that is a legal standard. Right. Absolutely. Absolutely. If the case you're talking about didn't look at it from that standpoint, it wouldn't be controlling precedent. Well, that case was, they diagnosed it based primarily on her subjective complaints. And the court held that her subjective reports of pain could be the basis of the doctor's opinion. Okay, but if the agency didn't have a definition of what makes this impairment medically determinable at the time of that opinion, and now does have a definition. Right. I see what you're... What I'm saying is that... Then the precedent may or may not be controlled. I agree, but I think... It takes some work. I haven't done the work. I agree with you, but I think, for sure, the 12.2p regulation is not controlling in this case. So, if there are no other questions. Thank you for the arguments on both sides. The case is submitted, and we will take it under consideration.